UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS J. REID, JR.,                    :
                                        :
          Plaintiff                     :    No. 3:11-CV-2001
                                        :
     vs.                                :    (Complaint Filed 10/27/11)
                                        :
CAROLYN W. COLVIN, ACTING               :
COMMISSIONER OF                         :    (Judge Munley)
SOCIAL SECURITY,                        :
                                        :
          Defendant                     :

**MEMORANDUM**

**Background**

        The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Thomas J. Reid, Jr.'s claim for social security
disability insurance benefits.

        Reid protectively filed[1] his application for disability
insurance benefits on September 12, 2008. Tr. 14, 70, 72-75 and
107.[2]  The application was initially denied by the Bureau of
Disability Determination on March 4, 2009.[3] Tr. 14 and 72-75.  On

----

1. Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

2. References to "Tr.__" are to pages of the administrative
record filed by the Defendant on December 30, 2011.

3. The Bureau of Disability Determination is an agency of the
state which initially evaluates applications for disability

April 3, 2009, Reid requested an administrative hearing. Tr. 78. After 11 months had passed, a hearing was held on March 18, 2010, before an administrative law judge. Tr. 48-69. On April 7, 2010, the administrative law judge issued a decision denying Reid's application. Tr. 14-27. On April 30, 2010, Reid filed a request for review with the Appeals Council. Tr. 8-10. After over 16 months had passed, the Appeals Council concluded that there was no basis upon which to grant Reid's request for review. Tr. 1-5. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Reid then filed a complaint in this court on October 27, 2011. Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on June 1, 2012, when Reid elected not to file a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Reid met the insured status requirements of the Social Security Act through December 31, 2009. Tr. 14, 16, 95 and 107. In order to establish entitlement to disability

_____

insurance benefits on behalf of the Social Security Administration. Tr. 72.

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

insurance benefits Reid was required to establish that he suffered from a disability on or before that date.  42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Reid, who was born in the United States on April 18, 1974,[5] graduated from high school in 1992, and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 26, 52-53, 111, 117, 131 and 173. During his elementary and secondary schooling, Reid attended regular education classes. Tr. 117.  After graduating from high school, Reid attended college for two years at Nassau Community College in East Garden City, New York, on Long Island, but did not obtain a degree. Tr. 117 and 173.[6]  Reid has a driver's license and he is able to drive.  Tr. 53.  Reid drove himself to the administrative hearing from Athens, Pennsylvania, to Wilkes-Barre which he testified was about a 20 minute drive.[7] Tr. 53.

---

5. At the time of the administrative hearing and the administrative law judge's decision, Reid was 35 years of age and considered a "younger individual" whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. § 404.1563(c).  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

6. Nassau Community College offers several two-year associate degree programs. Nassau Community College, http://www.ncc.edu/programsandcourses/ (Last accessed May 24, 2013).

7. A round-trip drive between Athens and Wilkes-Barre is approximately 166 miles. See distancebetweencities, http://www.distancebetweencities.net/wilkes-barre_pa_and_athens_pa/ (Last accessed May 24, 2013).  The one-way trip is reported to take 1 hour and 50 minutes. Id.

Reid held five jobs which can be considered past relevant employment.[8]  Those positions were as a maintenance supervisor and a carpet/upholstery cleaner described by a vocational expert as skilled, medium work as generally performed but heavy as actually performed by Reid; a store manager described as skilled, light work; a fence worker described as semi-skilled, medium work as generally performed but light work as actually performed by Reid; and as a textile salesperson described as semi-skilled, medium work.[9] Tr. 66-67.

---

8. Past relevant employment in the present case means work performed by Reid during the 15 years prior to the date his claim for disability benefits was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

9. The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are

4

Reid reported that he worked in textile sales from September 2004 to December 2004. Tr. 136 and 138. He stated that he would work 8 hours per day, 5 days per week, driving a truck and delivering uniforms and doormats. Id. With respect to the fence installation position, Reid stated that he held that position from March 2002 to September 2004. Tr. 136. He reported that he worked 3 to 6 hours per day, 3 to 5 days per week, and that his duties primarily consisted of running errands for his cousin who owned the company. Tr. 61 and 137. From September 1996 to January 2002, Reid reported that he was engaged in carpet and upholstery cleaning/sales 8 to 10 hours per day, 5 days per week. Tr. 136 and 142. He would walk 5 to 6 hours and sit 3 to 4 hours per day. Tr. 142. The heaviest amount lifted was 50 pounds and he would frequently lift 10 pounds. Id. From January 2002 to March 2002, Reid was also involved in carpet and upholstery cleaning/sales. Tr. 136 and 139. During that period, he worked

---

additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

from 4 to 8 hours per day, 3 to 5 days per week,[10] driving a van from house to house negotiating carpet cleaning contracts. Tr. 139. From June 1994, to June 1996, Reid stated that he worked as a "floor maintenance supervisor" 8 hours per day, 5 days per week and that he supervised several crews and drove tucks with equipment to job sites. Tr. 141. Reid also stated that he worked 8 hours per day, 5 days per week, as a manager of a tuxedo rental store from June 1992 to June 1994. Tr. 136 and 140.

In another document filed with the Social Security Administration, Reid described his work history as a retail clerk from 1992 to 1994, a carpet laborer from April 1996 to December 2006, and a maintenance supervisor from 1994 to 1996. Tr. 119.

Records of the Social Security Administration reveal that Reid had earnings in the years 1990 and 1992 through 2006. Tr. 96. Reid's highest annual earnings were $15,696.50 in 1997 when he was employed in the field of carpet and upholstery cleaning/sales. Tr. 96 and 136. Reid's total reported earnings from 1990 through 2006 were $112,760.99. Id. Reid has no reported earnings after 2006. Id.

Reid claims that he became disabled on February 24, 2001, because of both physical and mental problems. Tr. 78 and 91. The physical problems alleged include herniated intervertebral discs of the lumbar spine, degenerative disc disease of the lumbar spine and the pain and other symptoms

---

10. Reid gave two sets of figures for this position. He first stated he worked 4 to 6 hours per day, 3 to 5 days per week, and then below those figures stated he worked 6 to 8 hours per day 4 to 5 days per week. Tr. 139.

associated with those conditions.[11]   Tr.

---

11. Discogenic disease or degenerative disc disease is disease or
degeneration of the intervertebral discs.  The intervertebral
discs, the soft cushions between 24 of the bony vertebral bodies,
have a tough outer layer and an inner core composed of a gelatin-
like substance, the nucleus pulposus. The outer layer of an
intervertebral disc is called the annulus fibrosus. A bulge
(protrusion) is where the annulus of the disc extends beyond the
perimeter of the vertebral bodies. A herniation is where the
nucleus pulposus goes beyond its normal boundary into the annulus
and presses the annulus outward or ruptures the annulus. Such
bulges(protrusions) and herniations if they contact nerve tissue
can cause pain.  Degenerative disc disease (discogenic disease)
has been described as follows:

> As we age, the water and protein content of the
> cartilage of the body changes. This change results in
> weaker, more fragile and thin cartilage. Because both
> the discs and the joints that stack the vertebrae
> (facet joints) are partly composed of cartilage, these
> areas are subject to wear and tear over time
> (degenerative changes). The gradual deterioration of
> the disc between the vertebrae is referred to as
> degenerative disc disease. . . Wear of the facet
> cartilage and the bony changes of the adjacent joint is
> referred to as degenerative facet joint disease or
> osteoarthritis of the spine. Trauma injury to the spine
> can also lead to degenerative disc disease.
>
> Degeneration of the disc is medically referred to as
> spondylosis. Spondylosis can be noted on x-ray tests or
> MRI scanning of the spine as a narrowing of the normal
> "disc space" between the adjacent vertebrae.
>
> Degeneration of the disc tissue makes the disc more
> susceptible to herniation. Degeneration of the disc can
> cause local pain in the affected area. Any level of the
> spine can be affected by disc degeneration. When disc
> degeneration affects the spine of the neck, it is
> referred to as cervical disc disease. When the mid-back
> is affected, the condition is referred to as thoracic
> disc disease. Disc degeneration that affects the lumbar
> spine can cause chronic low back pain (referred to as
> lumbago) or irritation of a spinal nerve to cause pain
> radiating down the leg (sciatica). Lumbago causes pain
> localized to the low back and is common in older

9, 78 and 112.  The mental impairments alleged include

depression, anxiety and panic attacks. Tr. 9 and 78.

The impetus for Reid's alleged disabling conditions was

an injury sustained to his back when he was working as a carpet

cleaner on February 24, 2001. Tr. 161, 163, 165 and 287. He

apparently was attempting to move a heavy carpet cleaning unit as

well as holding a door open at the same time when this injury

occurred. Id.  Reid alleges that he can not sit, stand or walk

for long periods of time; and that he cannot lift, squat, bend,

reach, kneel or climb stairs because of his low back and leg

pain.  Tr. 133.  He claims that "every movement is affected [by

---

people. Degenerative arthritis (osteoarthritis) of the
facet joints is also a cause of localized lumbar pain
that can be detected with plain x-ray testing is also
a cause of localized lumbar pain.  The pain
from degenerative disc disease of the spine is usually
treated conservatively with intermittent heat, rest,
rehabilitative exercises, and medications to relieve
pain, muscle spasms, and inflammation.

William C. Shiel, Jr., M.D., Degenerative Disc Disease and
Sciatica, MedicineNet.com, http://www.medicinenet.
com/degenerativedisc/page2.htm (Last accessed May 24, 2013).
Degenerative disc disease is considered part of the normal aging
process. Id.
        Radiculopathy is a condition where one or more nerves
or nerve roots are affected and do not work properly. The nerve
roots are branches of the spinal cord.  They carry signals to the
rest of the body at each level along the spine. Radiculopathy is
a result of disc herniation or an injury causing foraminal
impingement of an exiting nerve (the narrowing of the channel
through which a nerve root passes). See, generally,
Radiculopathy, MedicineNet.com, http://www.medicinenet.com
/radiculopathy/article.htm (Last accessed May 24, 2013).  A
herniated disc is one cause of radiculopathy. Id.  Radiculopathy
is a step beyond degenerative disc disease and severe cases may
requires surgical intervention. Id.  However, "the majority of
patients respond well to conservative treatment options." Id.

his] back injury" and that his "memory has gotten worse from pain or medications." <u>Id.</u>

In a "Function Report - Adult" submitted during the administrative proceedings, Reid indicated that he performed a range of daily activities. Tr. 128-135. Reid watches TV with his children. Tr. 129. Reid prepares simple meals and performs household chores including sitting on a lawn mower. Tr. 130. Reid goes outside everyday and is able to drive and ride in a motor vehicle. Tr. 131. Reid is able to go out alone and shop in stores. <u>Id.</u> He is also able to shop by phone, mail and the computer. <u>Id.</u>
Reid is able to pay bills, count change, handle a savings account, and use a checkbook and money orders. <u>Id.</u> He enjoys reading, watching TV and spending time with family. <u>Id.</u> In the "Function Report," Reid when asked to check items which his "illnesses, injuries, or conditions affect" did <u>not</u> check hearing, seeing, understanding, following instructions and getting along with others. Tr. 133

For the reasons set forth below we will affirm the decision of the Commissioner denying Reid's application for disability insurance benefits.

## **STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. <u>See</u> <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>, 181 F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the

Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is
to determine whether those findings are supported by "substantial
evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.
1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).
Factual findings which are supported by substantial evidence must
be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34,
38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported
by substantial evidence, we are bound by those findings, even if
we would have decided the factual inquiry differently."); Cotter
v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by
the Secretary must be accepted as conclusive by a reviewing court
if supported by substantial evidence."); Keefe v. Shalala, 71
F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171,
176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 &
1529 n.11 (11th Cir. 1990).

        Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565
(1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197,
229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d
198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360
(3d Cir. 1999). Substantial evidence has been described as more
than a mere scintilla of evidence but less than a preponderance.
Brown, 845 F.2d at 1213. In an adequately developed factual
record substantial evidence may be "something less than the
weight of the evidence, and the possibility of drawing two
inconsistent conclusions from the evidence does not prevent an

10

administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason</u>, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,

11

> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work. For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in
> significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating claims for disability insurance benefits. <u>See</u> 20 C.F.R. §404.1520; <u>Poulos</u>, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[12] (2) has an impairment that is severe or a combination of impairments that is severe,[13] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[14] (4) has the residual functional capacity to return

---

12. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

13. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. <u>Id.</u> If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

14. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the

to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[15]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's

---

claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

15. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

decision and the arguments of counsel, we will review in detail the medical records. Other than an MRI of Reid's lumbar spine performed on July 23, 2001, the medical records commence with an appointment Reid had with a neurologist on June 2, 2005. At the administrative hearing, counsel for Reid was asked if there was anything further to submit and he answered that question in the negative. Tr. 50.

The MRI of July 23, 2001, revealed "straightening of the normal lordosis [curvature of the spine]," "[d]isc desiccation[16] from L4 through S1 where there are central disc herniations," and "bilateral facet arthropathy[17] from L3 through S1 and a 5 mm retrolisthesis of L5 over S1."[18] Tr. 265. After this MRI was performed, Reid went back to work. The record reveals that Reid's earnings were $2006.49 in 2002, $11,278.08 in 2003 and $13,25.84 in 2004. Tr. 96.

On June 2, 2005, Reid was examined in connection with a workers' compensation proceeding by Paul E. Buckthal, M.D., a neurologist, at the Guthrie Clinic, located in Sayre,

---

16. Desiccation is the loss of water content.

17. The human spine consists 33 vertebrae of which 24 compose the cervical, thoracic and lumbar spine. Those 24 vertebrae are connected by facet joints. Each facet joint has two surfaces of bone covered by cartilage. The loss of the cartilage between the facet joints is known as facet arthropathy and can cause pain. Facet Arthropathy, About.com, http://arthritis.about.com/od/spine/p/facet_joints.htm (Last accessed September 21, 2011).

18. Retrolisthesis is a backward (posterior) slippage of one vertebral body with respect to the one immediately below. See generally Retrolisthesis, http://www.poulinchiro.com/doctor/chiropractor/chiropractic-Ashburn/id-your-pain/retrolisthesis (Last accessed May 24, 2013).

14

Pennsylvania. Tr. 161-162.  Dr. Buckthal conducted a clinical interview and performed a physical examination. Id.  The physical examination revealed that Reid was able to walk on his heels and toes,[19] perform deep knee bends symmetrically and hop on his left leg (but declined to hop on his right). Tr. 162.  Straight leg raising tests were normal bilaterally.[20] Id.  Reid was able to forward bend to the knees. Id.  Strength testing and reflexes were normal. Id.  Reid had no evidence of muscle atrophy. Id. Reid had a modest decrease in sensation to light touch (10 to 20 percent) on the top of the right foot and the side of the calf. Id.  Pulses were intact and skin color, temperature and texture were normal. Id.  Reid had no deformities in the lower lumbar spine. Id.  Dr. Buckthal's impression was in toto as follows: "The patient's neurological back examination does not reveal substantial neuromuscular deficits.  Multiple investigations have been carried out in the past and the patient tells me that surgery has been suggested at various times.  The primary sources

---

19. The heel walk test requires the patient to walk on his or her heels. The inability to do so suggests L4-L5 nerve root irritation. The toe walk test requires the patient to walk on his or her toes. The inability to do so suggests L5-S1 nerve root irritation. Clinical Examination Terminology, MLS Group of Companies, Inc., https://www.mls-ime.com/articles/GeneralTopics/ Clinical%20Examination%20Terminology.html (Last accessed May 24, 2013).

20. The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed May 24, 2013).

of these recommendations are not available.  At this time he does not seem to be a surgical candidate, although there is considerable description of pain and discomfort, the physical findings do not suggest a well localized root or disc lesion, which would be susceptible to such remediation." Id.

An MRI was performed of Reid's lumbar spine on June 3, 2005, which revealed a moderate disc protrusion compressing the "sacral [thecal] sac"[21] at the L4/L5 level, facet hypertrophy[22] causing mild neural foraminal narrowing at the L5/S1 level, a moderate disc protrusion at the L5/S1 level effacing the "sacral sac" without central spinal canal stenosis or neural foramina narrowing,[23] and degenerative desiccation with minimal narrowing of the intervertebral disc space at the L5/S1 level.  Tr. 282.

On June 14, 2005, Reid was examined by Edward L. Jones, M.D., at the Guthrie Clinic in Athens, Pennsylvania. Tr. 283. Dr. Jones's physical examination findings were as follows: "Examination reveals this muscular 31-year-old male to be in mild distress. He is a little slow to change position. Today, he walks with a normal gait. BACK: There is forward flexion of 60-70 degrees [normal being 80 to 105], extension of 30 degrees [normal

---

21. The thecal sac is an elongated tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run. It is a covering (membrane) that surrounds the spinal cord and contains cerebral spinal fluid. Herniated discs which impinge the thecal sac may or may not cause pain symptoms.

22.  Hypertrophy is an abnormal enlargement of an organ or tissue.

23. Stenosis is the narrowing of the spinal canal and it can also refer to the narrowing of the neural foramina which are the openings along the spine on both sides through which nerve roots exit.

25 to 60], side tilt motions of 30 degrees in the lumbar spine [normal being 35 to 40]. Straight leg raising is positive on the right at about 40 to 50 degrees, and on the left at about 60 to 70 degrees for pain in the back. Iliopsoas sign is still positive on the right.[24] LOWER EXTREMITIES: There is good symmetrical motor strength and tone in the lower extremities. Pin prick and vibration are intact and symmetrical in the lower extremities." Id. Dr. Jones's impression was that Reid suffered from chronic low back pain with bulging discs at L4-L5 and L5-S1. Id. Reid was advised to continue walking at least a half-hour a day and also continue performing stretching exercises. Id.

On July 26, 2005, Reid had an electromyography performed at the Robert Packer Hospital, in Sayre, Pennsylvania. Tr. 293. The results revealed an L5 nerve root dysfunction on the right side. Id.

On August 16, 2005, Reid was examined by Erik M. Gregorie, M.D., a neurosurgeon, at the Guthrie Clinic in Sayre, Pennsylvania. Tr. 163-164. Reid had a normal neurological examination other than with respect to "a marginal decrement [in sensation] involving the right L5 nerve root." Tr. 164. Dr.

---

24. The iliopsoas muscle [is] one of the largest and most powerful hip flexors . . . It is a major muscle responsible for movement of the leg and trunk . . . Low back pain is often misdiagnosed as it relates to the joints of the lumbar spine. Attention may be given to these joints when the source of diffuse achy pain may actually be the iliopsoas muscle. . . The iliopsoas muscle inserts onto the vertebrae of the lumbar spine, and when it is hypertonic or in spasm, it may cause significant dysfunction in the spine and put added pressure on the discs." Blake Biddulph, D.C., Iliopsoas Muscle Injury Symptoms, Livestrong.com, http://www.livestrong.com/article/88551-iliopsoas -muscle-injury-symptoms/ (Last accessed May 24, 2013).

Gregorie noted that Reid had normal muscle strength and tone, normal station and gait and that Reid was "a well-muscled individual, who appears to work out regularly, although he notes that he has not done this for some time now." Id. Dr. Gregorie reviewed the MRI of June 3, 2005, and stated that it did not reveal any central canal stenosis but a degree of "lateral stenosis" at the L4-L5 level. Id. Dr. Gregorie's impression was that Reid's right leg pain was related to the right-sided disc bulge at the L4-L5 level and recommended further diagnostic testing to determine the presence or absence of nerve root lesions at the L5-S1 level. Id. Dr. Gregorie's recommendation was that if there were such lesions that surgery would be appropriate. Id.

Reid's next medical appointment occurred on May 24, 2006, at the Guthrie Clinic in Sayre. Tr. 165-166. Reid on that date was examined by John W. Lockard, M.D., a pain specialist. Id. Physical examination findings were essentially unchanged. Id. Dr. Lockard administered a series of epidural steroid injections. Id.

In September and November, 2006, Reid was examined at the Guthrie Clinic by Kim Trahan, a physicians assistant, and possibly Dr. Jones but it is not clear that Dr. Jones actually examined Reid or merely signed off on Mr. Trahan's report. Tr. 280-281. The report of the September 14th appointment reveals no adverse objective findings regarding Reid's low back problem. Tr. 281. The report of the November 2nd appointment reveals that Reid's back was nontender with a small amount of spasm. Tr. 280. Two provocative diagnostic tests suggested right low back and leg

18

pain. Id.

Approximately a year later, Reid had an appointment on October 22, 2007, with Robert L. Madden, M.D., at Interventional Pain Management Associates, who administered L2-L5 medial branch pain blocks. Tr. 271-272.  The report of this appointment contains no objective physical examination findings. Id.

On November 5, 2007, Reid had an appointment with physicians assistant Trahan and possibly Dr. Jones. Tr. 278-279. The results of a physical examination were essentially normal. Id.  Reid's back was nontender and without spasm. Id. Provocative diagnostic testing did suggest right low back and leg pain. Id.

On December 17, 2007, Reid had a CT scan of the lumbar spine which revealed the following: (1) no abnormality at the L3-L4 level; (2) "a complete tear at the 6 o'clock position with localized epidural leakage;" and (3) "[t]he L4-L5 disk is totally disintegrated with localized epidural leakage posterior laterally on the right side." Tr. 268.  On the same day, Reid had a provocative discography performed which revealed internal disc disruption and low back and right leg pain. Tr. 270.

Reid was examined and treated by Cherilyn White, M.D., a family practitioner, on June 20, August 22, and October 3, 2008, and January 13, 2009. Tr. 211-213, 215-218, 220-223, 249-253  256-258, 261.

At the appointment on June 20, 2008, the only objective findings recorded by Dr. White were as follows: paraspinal spasm right greater than the left with sacroiliac joint and sciatic nerve tenderness;  a positive straight leg raising test; and normal strength and reflexes. Tr. 259.  Dr. White's assessment

was that Reid suffered from low back pain and radiculopathy and she prescribed the pain medication hydrocodone. Tr. 211 and 213. Dr. White in a conclusory fashion stated that Reid was totally disabled but also noted that Reid needed a functional capacity evaluation and that she would reevaluate him in 4 to 6 weeks. Id.

In the report of the appointment held on August 22, 2008, Dr. White did not record any objective physical examination findings.[25] Tr. 216. Dr. White's diagnosis was low back pain, high blood pressure and anxiety, and she prescribed hydrocodone and Ultram (tramadol) to treat Reid's pain, clonazepam for his anxiety and metoprolol for his high blood pressure. Tr. 215 and 217. Dr. White in a conclusory fashion stated that Reid was totally disabled and noted that she would reevaluate him in 4 to 6 weeks. Tr. 215.

In the report of the appointment held on October 3, 2008, Dr. White did not record any objective physical examination findings.[26] Dr. White's diagnosis was low back pain with impotency and depression and she prescribed medications, including "adding buspar," a medication used to treat anxiety. Tr. 218. Dr. White in a conclusory fashion stated that Reid was totally disabled and noted that she would reevaluate him in 4 to 6 weeks. Id.

On November 3, 2008, Dr. White completed a 4-page form

25. A nurse did record Reid's vital signs, including his blood pressure which was elevated at 136/98. Tr. 216.

26. A nurse did record Reid's vital signs, including his blood pressure which was elevated at 138/94. Tr. 220.

on behalf of Reid in which she stated that she last saw Reid on October 3, 2008; her diagnosis was that Reid suffered from low back pain that commenced on February 24, 2001,[27] and that he has not worked since that date;[28] Reid's "treatment modalities" were the pain medication hydrocodone and exercises for the upper body; Reid had positive supine and seated straight leg raising tests with pain in the right lower back;[29] Reid had normal sensation and reflexes; Reid had 4+ motor power (5 being normal); Reid had normal cervical range of motion; Reid had abnormal lumbar range of motion, including no ability to bend forward;[30] Reid did not need a hand held assistive device; Reid was unable to walk on heels and toes; and Reid would get on and off the examination table "with discomfort."[31] Tr. 169-172.

The report of the appointment held on January 13, 2009, does not reveal any abnormal physical examination findings other than Reid's blood pressure was elevated at 140/98. Tr. 249. On a check box form, Dr. White noted that Reid had a <u>normal musculoskeletal examination</u>. Tr. 222 and 249. Dr. White further

27. There is no indication that Dr. White treated Reid prior to June 20, 2008. Tr. 114.

28. As reviewed earlier in this memorandum, Reid worked during the years 2002 through 2006.

29. Although asked to specify the degree of elevation which produced the pain, Dr. White did not do so. Tr. 169.

30. Dr. White stated that Reid's flexion/extension in degrees of the "dorso lumbar region" was 0. Tr. 170    80 to 105 degrees of flexion is normal. 30 degrees of extension is considered normal.

31. In Dr. White's records of treating and examining Reid, she never recorded such findings.

21

indicated that Reid's anxiety was "better." Tr. 223. Dr. White's assessment was that Reid suffered from high blood pressure, anxiety and low back pain. Id. Dr. White prescribed medications for pain and high blood pressure.[32] Id. On a form for the New York Workers' Compensation Board, Dr. White in a conclusory fashion stated that Reid had a 60% temporary impairment and that Reid could not return to work because his "pain [was] only modestly controlled." Tr. 251.

On January 8, 2009, Reid was evaluated by Lynnette G. Ruch, Ph.D., a psychologist, on behalf of the Bureau of Disability Determination. Tr. 173-180. Dr. Ruch's report sets forth Reid's subjective complaints obtained during the clinical interview. Id. As for mental status findings, Dr. Ruch observed that Reid's affect was depressed and Reid cried frequently. Tr. 175. Reid reported attempting suicide at least three times in the last year but stated that "he had an epiphany and does not want to upset his children by suiciding."[33] Id. Reid denied homicidal ideations; Reid had no perceptual disturbances; Reid's thought processes were intact; his insight and judgment appeared to be fair to good; he had no obsessive thinking or compulsive behavior; he had no paranoia or suspiciousness; and he was

---

32. Dr. White also prescribed the drug Viagra. Tr. 223.

33. Other than his claim of attempting suicide on three occasions during the period January 8, 2008, to January 8, 2009 (the date of Dr. Ruch's evaluation), the administrative record does not contain evidence that Reid attempted suicide. There are no police or hospital emergency department records or third-party statements regarding such attempts contained within the administrative record.

oriented to person, place and time. Tr. 175-176. In a form regarding, Reid's work-related mental functional ability, Dr. Ruch stated that Reid had no limitations with respect to understanding and remembering short, simple instructions, understanding and remembering detailed instructions, making judgments on simple-work related decisions, and interacting appropriately with the public, supervisors and co-workers; Reid had a slight limitation with respect to carrying out short, simple instructions; and Reid had moderate limitations with respect to carrying out detailed instructions, responding appropriately to work pressures in a usual work setting, and responding appropriately to changes in a routine work setting. Tr. 179  After performing the clinical interview and the mental status examination, Dr. Ruch concluded that Reid suffered from major depression, posttraumatic stress disorder and panic disorder and gave him a Global Assessment of Functioning (GAF) Score of 40.[34] Tr. 178.

---

34. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas,  such as work or school, family relations, judgment, thinking or mood. Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. One GAF score is of limited value and is not necessarily an indicator of the individual ability to hold a job. See Ramos v. Barnhart, 513

On February 6, 2009, Mark Hite, Ed.D., a psychologist, reviewed on behalf of the Bureau of Disability Determination Reid's medical records and Dr. Ruch's report and concluded that Reid was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment." Tr. 183. Dr. Hite noted that Reid's medical records revealed no hospitalizations because of mental impairments and no mental health treatment other than medications prescribed by his primary care physician, Dr. White. Id. Dr. Hite based on his review of the medical records found that Reid suffered from major depressive disorder, posttraumatic stress disorder and panic disorder without agoraphobia. Id. Dr. Hite stated that his assessment was consistent with that provided by Dr. Ruch. Id.

On February 13, 2009, Gerald A. Gryczko, M.D., reviewed Reid's medical records on behalf of the Bureau of Disability Determination and concluded that Reid had the physical functional ability to engage in a limited range of light work. Tr. 199-205. The limitations imposed by Dr. Gryczko included occasional postural activities, such as stooping and bending, and a prohibition against frequent repetitive right leg motions. Tr. 200-201.

On February 25 and April 8, 2009, Reid had appointments with Dr. White. Tr. 224-227 and 243. Dr. White's reports of

---

F.Supp.2d 249, 261(E.D.Pa. 2007)(Yohn, J.) This is especially true in this case because Dr. Ruch completed a mental functional assessment which only set forth three moderately limited mental areas of functioning out of a total of 10 areas rated. Reid had no marked or extreme mental limitations.

these appointments do not reveal any adverse objective physical examination findings other than vital signs. Id. On February 25th Reid's blood pressure was 130/84 and on April 8th it was 136/98. Tr. 224 and 243. Also, on February 25th Dr. White noted that Reid was "[a]ble to sit [with] [right] leg crossed over [left]." Tr. 224. Dr. White's diagnosis on February 25th was low back pain, high blood pressure and anxiety and on April 28, 2009, low back pain and anxiety. Tr. 225 and 227.

On June 1, 2009, Reid visited the emergency department at Robert Packer Hospital, located in Sayre, Pennsylvania, complaining of having had a seizure. Tr. 273-276 and 307. Reid told the emergency room physician that he was under stress financially and that he "took some hydroxyzine of his wife's today for anxiety."[35] Tr. 275. Reid underwent a physical examination and diagnostic testing, including a CT scan of the head, and after the testing which did not reveal anything of significance he was discharged from the hospital on the same day with instructions to follow-up with his primary care physician. Tr. 273 and 275.

On June 6, 2009, Reid had an appointment with Dr. White which appears to be a regularly scheduled follow-up appointment. Tr. 240. Other than vital signs, the only objective physical examinations findings noted by Dr. White were as follows: "Tight [right] paraspinous spasm, soft on [left], neck soft [negative] spasm." Id.

---

35. Hydroxyzine is a sedative used to treat anxiety and tension. Hydroxyzine, Drugs.com, http://www.drugs.com/hydroxyzine.html (Last accessed May 28, 2013).

On June 9, 2009, Reid underwent an MRI of the brain which was interpreted by the radiologist as "[e]ssentially normal." Tr. 308.

On July 6, 2009, Reid had an appointment with Lonnie Stethers, a nurse practitioner, which appears to be a follow-up appointment regarding the seizure he allegedly suffered on June 1, 2009. Tr. 309-311. The result of a physical examination performed by Ms. Stethers were essentially normal, including Reid was alert and oriented to person, place and time, and he had normal reflexes, normal coordination and a normal gait.[36] Tr. 310. Ms. Stethers's diagnosis was that Reid suffered from a "[s]olitary generalized seizure" which possibly was "related to increased stress and infection, which would lower seizure threshold[.]" Tr. 311. It was noted that Reid had been driving since the June 1st seizure. Id. Reid was advised not to drive. Id.

On October 6 and September 4, 2009, Reid had follow-up appointments with Dr. White. Tr. 234-239. No significant objective physical examination findings were recorded on either occasion. Id.

On October 8, 2009, Reid had an appointment with Ms. Stethers regarding his alleged history of a single seizure. Tr. 313-316. Other than high blood pressure, the physical examination was normal: Reid was alert and oriented to person, place and time, he had normal reflexes, strength and muscle tone, and he had normal gait and coordination. Tr. 314. Ms. Stethers's

---

36. Reid's blood pressure was elevated at 148/92. Tr. 310.

impression was that Reid suffered from an isolated generalized seizure with no reports of additional seizures. Id. She further noted that she would take steps to have his license reinstated if he was seizure free at the next appointment in December. Id.

On November 24, 2009, Reid had an appointment with Dr. White at which he complained of an episode of pain in the middle of his back. Tr. 231. A physical examination performed by Dr. White revealed a "stiff [right] leg;" spasm in the lumbosacral region on the left; right sacroiliac joint tenderness; and right sciatic nerve tenderness. Tr. 231.

On December 1, 2009, Reid had an appointment with Ms. Stethers regarding his alleged isolated seizure. Tr. 317-318. No adverse objective physical examination findings were recorded by Ms. Stethers. Tr. 318. Ms. Stethers noted that Reid had suffered a "solitary seizure on 6-1-2009 with no subsequent seizure activity" and that he was not on anti-epileptic drugs. Id. Ms. Stethers completed paper work to have Reid's drivers license reinstated. Id.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process gave Reid the benefit of the doubt and found that he had not engaged in substantial gainful work activity during the period February 24, 2001, through his date last insured of December 31, 2009. Tr. 16-17.

At step two of the sequential evaluation process, the administrative law judge found that Reid had the following severe impairments: "degenerative disc disease and depression[.]" Tr. 17. The administrative law judge found that the "single seizure

27

in June 2009" was a non-severe impairment but as a cautionary measure the administrative law judge, as explained in detail below, included limitations relating to that condition in the residual functional capacity assessment. Id. The administrative law judge found that Reid's panic attacks were non-severe because medications were effective in controlling them but the ALJ also included some limitations relating to them in the RFC assessment. Tr. 17-18. The administrative law judge further noted that Reid claimed he suffered from attention deficit disorder but found that it was "a non-medically determinable impairment" because the medical records did not contain such a diagnosis supported by "clinical and laboratory diagnostic techniques." Tr. 18. As for Reid's high blood pressure, the administrative law judge found that condition to be a non-severe impairment because neither Reid nor his counsel claimed it was a severe impairment and there was no evidence that it caused any limitation in his ability to perform work activities. Id.

        At step three of the sequential evaluation process the administrative law judge found that Reid's impairments did not individually or in combination meet or equal a listed impairment. Tr. 18-21. In so finding the ALJ relied on the opinion of Dr. Hite and Dr. Ruch. Tr. 19.

        At step four of the sequential evaluation process the administrative law judge found that Reid could not perform his prior relevant semi-skilled to skilled, light to heavy work but that he had the ability to engage in a limited range of unskilled, light work. Tr. 21. The limitations imposed by the ALJ were that Reid could sit for six hours and stand for 2 hours

during an 8-hour workday; he could never engage in crawling or climbing ladders or scaffolds; Reid could only occasionally bend and stoop; he could never push or pull with the lower extremities; he could never perform work involving exposure to dangerous machinery or unprotected heights; and he could only perform work involving simple, repetitive tasks. Tr. 21. In setting this residual functional capacity, the administrative law judge gave little weight to the conclusory opinions of Dr. White and relied on the opinions of the state agency psychologists and the state agency physician. In addition, the ALJ found that Reid's statements about his pain and functional limitations were not credible. Tr. 23 and 25.

Based on the above residual functional capacity and the testimony of a vocational expert the administrative law judge found that Reid could perform work as a video monitor, ticket taker and receptionist, and that there were a significant number of such jobs in the Northeastern region of Pennsylvania. Tr. 26. Consequently, the administrative law judge denied Reid's claim for disability insurance benefits. Id.

The administrative record in this case is 334 pages in length, primarily consisting of medical and vocational records. Reid argues that the ALJ erred by (1) rejecting the opinions of Dr. White, Dr. Madden, Dr. Jones and Dr. Ruch; (2) failing to assist claimant in developing the record; and (3) failing to properly consider Reid's credibility. We have thoroughly reviewed the record in this case and find no merit in Reid's arguments. The administrative law judge did an excellent job of reviewing Reid's vocational history and medical records in his

29

decision. Tr. 14-27. Furthermore, the brief submitted by the Commissioner adequately reviews the medical and vocational evidence in this case. Doc. 14, Brief of Defendant.

No treating or examining physician has indicated that Reid suffers from physical or mental functional limitations that would preclude him from engaging in the limited range of light work set by the administrative law judge in his decision for the requisite statutory 12 month period. Dr. White, Dr. Madden, and Dr. Jones never provided such a functional assessments and the opinions of Dr. Ruch, Dr. Hite and Dr. Gryczko are supportive of the ALJ's residual functional capacity assessment.

The Social Security regulations require that an applicant for disability benefits come forward with medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled." 20 C.F.R. § 404.1512(c). Reid failed to provide such evidence. Absent from the record is any evidence that Reid suffered from physical or mental functional limitations that would preclude him from engaging in the limited range of light work set[37] by the administrative law judge for the requisite statutory 12 month period.[38]

_____

37. In fact it appears that the jobs identified by the vocational expert are jobs at the sedentary level or at least the light exertional level which permit a sit/stand option.

38. To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by

The administrative law judge relied on the opinions of Dr. Ruch, Dr. Hite and Dr. Gryczko. The administrative law judge's reliance on those opinions was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

We are satisfied that the administrative law judge appropriately took into account all of Reid's physical and mental limitations established by the medical records in setting Reid's residual functional capacity. The administrative law judge concluded that Reid could engage in a limited range of light work. That conclusion is supported by the opinion of the state agency psychologists and physician.

As for Reid's claim that the ALJ did not adequately develop the record, Reid was represented by an attorney (the same attorney who represents him in this appeal) who has extensive experience in prosecuting disability cases and that attorney was asked by the ALJ at the administrative hearing if there was any further evidence that needed to be submitted. Under those circumstances, the ALJ fulfilled his duty to develop the record.[39]

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).

39. This court has remanded cases because of the failure of ALJs to develop the record. However, those cases involved claimants who were unrepresented at the time of the administrative hearing

The administrative law judge stated that Reid's
statements concerning the intensity, persistence and limiting
effects of his symptoms were not credible to the extent that they
were inconsistent with the ability to perform a limited range of
light work. Tr. 23. There is no basis to question that
credibility judgment.  The administrative law judge was not
required to accept Reid's claims regarding his physical or mental
limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d
Cir. 1983)(providing that credibility determinations as to a
claimant's testimony regarding the claimant's limitations are for
the administrative law judge to make).  It is well-established
that "an [administrative law judge's] findings based on the
credibility of the applicant are to be accorded great weight and
deference, particularly since [the administrative law judge] is
charged with the duty of observing a witness's demeanor . . . ."
Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th
Cir. 1997); see also Casias v. Secretary of Health & Human
Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ
as trier of fact, the individual optimally positioned to observe
and assess the witness credibility.").  Because the
administrative law judge observed and heard Reid testify, the
administrative law judge is the one best suited to assess the

or where the ALJ ignored the possibility that other evidence was
available which would bear on the disability determination and
that evidence was pointed out by counsel or strongly suggested by
other evidence in the record. In this case counsel did not raise
the issue of other evidence or request that the ALJ leave the
record open so that he could obtain additional evidence or even
make a request of the ALJ to obtain additional evidence before
making a decision.

credibility of Reid.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

s/ James M. Munley
JAMES M. MUNLEY
United States District Judge


Dated: May 31, 2013